UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                              Plaintiff,<br><br>v.<br><br>CLEMENTE RAMOS,<br><br>                              Defendant. | Case No.: 16cr467 JM<br><br>**ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AS FRUIT OF AN ILLEGAL SEARCH** |

     This case presents the question whether the recent Supreme Court case of <u>Riley v. California</u>, 134 S. Ct. 2473 (2014), generally requiring law enforcement to obtain a search warrant before accessing contents of a cell phone taken from an arrestee, applies to the manual border search of a cell phone taken from a drug courier following his arrest. Defendant, Clemente Ramos, was arrested at the Otay Mesa Port of Entry and charged with importation of methamphetamine, in violation of 21 U.S.C. §§ 952, 960. He contends any such search after an arrest and the confiscation of contraband, methamphetamine in this case, loses its character as a border search, and thereby becomes an investigatory search, i.e., a search to gather evidence of the crime. Under circumstances such as these, Defendant contends, <u>Riley</u> requires the issuance of a search warrant to manually search the phone for text and phone call history even while the arrestee and the phone are still situated at the border. The government submits the search

of Defendant's cell phone was a valid border search under existing Supreme Court and Ninth Circuit case law governing border searches, and that <u>Riley</u> does not alter the analysis.

## BACKGROUND[1]

### A. Arrest and Search

The facts material to this motion are essentially undisputed by the parties. Defendant Clemente Ramos applied for permission to enter the United States from Mexico through the Otay Mesa, California, Port of Entry on February 12, 2016, at about 3:30 a.m. He was driving a 2002 Honda Civic, and was the sole occupant of the car. A narcotics detector dog alerted to his car before it approached the primary booth. When Defendant approached the booth, he stated he had nothing to declare, he owned the car, and was on his way to work in San Diego. A Customs and Border Protection Officer directed the dog to sniff the interior of the car, and the dog alerted to the rear seat of the vehicle. Defendant was removed from the car and taken to the security office, and his vehicle was taken to secondary for further inspection.

The secondary inspection of the car revealed 11 packages of methamphetamine located inside the backseats of the vehicle, totaling 9.34 kilograms. During a second search of the car the following day, an additional 8.34 kilograms of methamphetamine were found in the gas tank of the car.

At about 8:07 a.m., a Homeland Security Investigations (HSI) special agent advised Defendant that he was under arrest and read him his <u>Miranda</u> rights. Defendant stated that he understood his rights and was willing to waive them to make a statement. In his statement, Defendant denied knowledge of the drugs found in his car and told the agents that he was en route to a job site in Chula Vista. Defendant stated that it was a "side job" and could not provide the exact address of the job site. He further stated that

---

[1] The facts in this section are drawn from the complaint (Doc. No 1), Defendant's motion and exhibits (Doc. No. 26 & Exhs. A – C), and the government's opposition (Doc. No. 27).

he was supposed to report to work by 5:00 a.m. that day, and that he had called his boss the day before to ask when to report for work.[2]  At about 9:39 a.m., the HSI agents conducted a manual search of Defendant's cell phone.  During this search, the agents viewed and took screenshots of incoming calls, select text messages, and portions of the call log.  In total, the agents took 14 screenshots but did not download the phone.  After Defendant's arrest, the agents obtained a search warrant to conduct a full forensic examination of the phone, the results of which are still pending.

### B. Defendant's Motion

Defendant has moved to suppress all evidence derived from the search of his cell phone as fruit of an illegal search, contending that his Fourth Amendment rights were violated because the agents searched his cell phone without a warrant.  Defendant argues the search does not fall under the border search exception to the warrant requirement because the search was conducted "to further the agents' investigation and not to prevent contraband from entering the country."  Finally, Defendant argues all the evidence and statements derived from this illegal search must be suppressed pursuant to the exclusionary rule of the Fourth Amendment.

### C. The Government's Opposition

In response, the government contends that the search of Defendant's cell phone falls squarely within the border search exception to the warrant requirement.  The government submits the cursory search at issue required no suspicion at all under the Ninth Circuit border search doctrine, but that even if the search were to be characterized as a forensic examination requiring reasonable suspicion, that standard was met in this case.

### D. Defendant's Reply

In his reply, Defendant reiterates that the search of his cell phone was not a border search, and that in any case, regardless of the classification of the search, the ultimate

---

[2] He later stated that he did not call him but sent him a message through Facebook.

question is whether the search was reasonable under the Fourth Amendment.  At oral argument, Defendant narrowed his position into a single argument: the search of his cell phone did not qualify as a border search given its investigatory purpose of gathering evidence following Defendant's arrest.

## DISCUSSION

While Defendant has significantly narrowed his position by asking the court to determine the search of his cell phone was not a border search but rather part of an investigation to gather evidence, this reductive approach gives short shrift to the border search doctrine and elides a considered inquiry into the interplay between that doctrine and Riley v. California, 134 S. Ct. 2473 (2014).

**A. Border Searches: Generally**

A proper analysis starts with the Fourth Amendment, which provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

The ultimate test, or "touchstone" of the Fourth Amendment is "reasonableness." Brigham City v. Stuart, 547 U.S. 398, 403 (2006).  The concept of "reasonableness" has been a constant in Fourth Amendment jurisprudence and dictates that "… all searches and seizures must be reasonable."  Kentucky v. King, 563 U.S. 452, 459 (2011).  Moreover, a warrant may not issue unless supported by probable cause with the scope of the authorized search set out with particularity.  Payton v. New York, 445 U.S. 573, 584 (1980).

Although the Fourth Amendment does not specify the circumstances requiring a warrant, the Supreme Court has held that a warrant must generally be obtained.  This is true from the paradigmatic search of a home (Brigham City v. Stuart, 547 U.S. 398, 403 (2006); Groh v. Ramirez, 540 U.S. 551, 559 (2004)) to the search of a cell phone taken from an arrested suspect (Riley v. California, 134 S. Ct. 2473, 2495 (2014)).  But because

1 "the ultimate touchstone of the Fourth Amendment is 'reasonableness,'" Brigham City, 547 U.S. at 403, the warrant requirement is subject to certain reasonable exceptions. The most notable exceptions to the warrant requirement include (1) a search incident to arrest, Chimel v. California, 395 U.S. 752 (1969); (2) plain view, Coolidge v. New Hampshire, 403 U.S. 443 (1971); (3) consent, Illinois v. Rodriguez, 497 U.S. 177 (1990); (4) stop & frisk, Terry v. Ohio, 392 U.S. 1 (1968); (5) the automobile exception, Carroll v. United States, 267 U.S. 132 (1925); (6) exigent circumstances, Kentucky v. King, 563 U.S. 452 (2011); and (7) border searches, United States v. Ramsey, 431 U.S. 606 (1977).

The analysis of the border search exception to the warrant requirement begins from the proposition that "[t]he Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border." United States v. Flores–Montano, 541 U.S. 149, 152 (2004). It is therefore a well-established principle that searches made at the border are reasonable "simply by virtue of the fact that they occur at the border." United States v. Ramsey, 431 U.S. 606, 616 (1977).

A border search need not take place *at* the physical border. There are two different ways a search may fall within the border search exception even though it does not occur at a physical border. First, courts have recognized the "functional equivalent" doctrine, which encompasses searches at "an established station near the border, at a point marking the confluence of two or more roads that extend from the border," or a search of passengers and cargo of an airplane arriving at a U.S. airport after a nonstop flight from abroad. Almeida-Sanchez v. United States, 413 U.S. 266, 273 (1973). Second, courts have also recognized the doctrine of "extended border searches," which provides border searches with spatial and temporal flexibility "within limits of reason related to the underlying constitutional concerns to protect against unreasonable searches." United States v. Bilir, 592 F.2d 735, 740 (4th Cir. 1979).

Despite being a paradigmatic exception to the warrant requirement, border searches are still subject to the "reasonableness" requirement of the Fourth Amendment. In addressing the "reasonableness" of border searches, the Supreme Court has

distinguished between "routine" and "nonroutine" searches, holding that "[r]outine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant." United States v. Montoya de Hernandez, 473 U.S. 531, 538 (1985) (citing Ramsey, 431 U.S. at 618-19). The Supreme Court has not directly articulated criteria differentiating routine from nonroutine searches, but has laid out the principles in broad strokes. In Flores-Montano, for example, the Supreme Court held that "the Government's authority to conduct suspicionless inspections at the border includes the authority to remove, disassemble, and reassemble a vehicle's fuel tank." 541 U.S. at 155. In Montoya de Hernandez, the Supreme Court held that customs officials' reasonable suspicion defendant was smuggling drugs in her alimentary canal was sufficient to justify her sixteen hours of detention while the border officials obtained a court order to conduct a rectal examination. 473 U.S. at 541. However, the Supreme Court expressly refrained from defining "what level of suspicion, if any, is required for nonroutine border searches such as strip, body cavity, or involuntary x-ray searches." Id. at 541 n.4. In any event, neither the Supreme Court nor any lower courts have ever required anything more than "reasonable suspicion" to justify searches at the border.

**B. Digital Border Searches**

Based on the general border search principles set forth by the Supreme Court, two main cases – United States v. Arnold, 533 F.3d 1003 (9th Cir.2008) and United States v. Cotterman, 709 F.3d 952 (9th Cir. 2013) – define current Ninth Circuit law on border searches of digital devices.

In Arnold, the Ninth Circuit held that warrantless searches of laptop computers or other personal electronic storage devices at the border did not require reasonable suspicion. 533 F.3d at 1008. There, the defendant was stopped by customs officials at the Los Angeles International Airport (LAX) on his way back from the Philippines, and was requested to turn on his laptop computer. Id. at 1005. Upon examination of two desktop folders, which revealed a photo of nude women, the defendant's laptop was then

searched for several hours by special agents who discovered images they believed to depict child pornography. Id. The court concluded no reasonable suspicion was required to search defendant's laptop because a search of a computer was no different than any other item of personal property. Id. at 1008. The court analogized the laptop search to the gas tank search of Flores-Montano, and held that case law did not support a finding that "a search which occurs in an otherwise ordinary manner, is 'particularly offensive' simply due to the storage capacity of the object being searched." Id. at 1010 (citing California v. Acevedo, 500 U.S. 565, 576 (1991)).

Five years later, in Cotterman, the Ninth Circuit held that a forensic digital border search was nonroutine and required reasonable suspicion. 709 F.3d at 968. In its en banc decision, the majority remarked that the "painstaking analysis" of a forensic examination, which in Cotterman involved the hard drive in its entirety, including data that seemingly had been deleted, was "akin to reading a diary line by line looking for mention of criminal activity – plus looking at everything the writer may have erased." Id. at 962-63. While the court affirmed the "unintrusive search" in Arnold as reasonable, it rejected Arnold's categorical approach to property searches by holding that a forensic search of digital devices was quantitatively and qualitatively different from searches of luggage or other personal property. The court noted that digital devices not only have the capacity to store "warehouses full of information," but they also contain "the most intimate details of our lives: financial records, confidential business records, medical records and private emails." Id. at 964.

The Cotterman majority recognized the government's significant interest in conducting searches at the border, especially in times of national crisis, but held that the relevant inquiry, as always, is one of reasonableness, and that a reasonableness determination must take into account differences in property. Id. at 966. Unlike a gas tank search, Flores–Montano, 541 U.S. at 150, which is unlikely to implicate the person's dignity and privacy interests, "the exposure of confidential and personal information has permanence," and "cannot be undone." Id. Accordingly, a forensic examination of

digital devices carries with it a significant expectation of privacy and thus renders "an exhaustive exploratory search more intrusive than with other forms of property." Id.

Finally, the Cotterman majority noted, in practical terms, suspicionless searches of the type approved in Arnold would continue, and the standard of "reasonable suspicion" for forensic examinations would leave ample room for agents to "draw on their expertise and experience to pick up on subtle cues that criminal activity may be afoot." Id. at 967.

Accordingly, the Cotterman decision has resulted in two standards for border searches of digital devices. While a manual search of digital devices does not require any suspicion at all, the more intrusive, forensic examination of digital devices triggers the "reasonable suspicion" standard.

**C. The Search of Defendant's Cell Phone**

Defendant's primary argument is that the search of his cell phone does not constitute a border search. Specifically, Defendant contends that the justification for a border search exception – preventing the entry of unwanted persons or contraband – is inapplicable here. (Doc. No. 26-1, p. 5). This is because unlike the searches in Arnold and Cotterman, where the purpose of the laptop searches was to prevent the entry of unwanted items into the United States, here, the search followed Defendant's arrest, and therefore, was "investigatory," i.e., conducted solely to gather evidence in an ongoing criminal investigation. (Id.). Essentially, Defendant argues that the "unwanted effects" here, methamphetamine, had already been seized hours before the agents searched the phone.

To the government's argument that the search took place at the border, Defendant responds that a warrantless search does not become a border search just because it takes place at a Customs and Border Protection office near the physical border. Defendant argues the court should find this search was not a border search for the following reasons. First, the purpose of the search was investigatory. (Id., citing United States v. Kim, 103 F. Supp. 3d 32, 57-59 (D.D.C. 2015)). Second, the government already admitted that the search was conducted incident to Defendant's arrest, and therefore, it triggers the warrant

requirement established by Riley v. California, 134 S. Ct. 2473 (2014). (Id. at p. 4).³
Third, Defendant contends, the search of the phone occurred more than five hours after his arrest. (Id.). Fourth, the agents searching the phone were not customs officials, but HSI special agents specifically assigned to investigate Defendant for drug trafficking. (Id.).

Finally, Defendant argues, regardless of the classification of the search, the court should find that this search was unreasonable under the Fourth Amendment by "assessing, on the one hand, the degree to which [the search] intrudes upon an individual's privacy and, on the other hand, the degree to which it is needed for the promotion of legitimate governmental interests." (Id. at p. 5, citing Riley, 134 S. Ct. at 2484). Here, according to Defendant, the search was a significant intrusion upon his privacy, given the nature and the volume of information cell phones contain. Yet, the search was not required to further any legitimate government interest because the agents could have waited to obtain a warrant before satisfying the "generalized interest in finding additional evidence of a completed crime." (Id. at p. 6).

Defendant's position is unsupported and ultimately unpersuasive. First, Defendant cites no authority, and the court has found none, supporting the proposition that a border search is somehow converted into a search incident to arrest if its nature is "investigatory." Defendant argues that there is a distinction between "investigatory" border searches and searches for the purpose of "protecting the United States' sovereign integrity by excluding unwanted persons or things," but he fails to explain how and why the search, conducted post-arrest and by HSI agents, was disqualified as a border search. The point Defendant misses is that a traditional (pre-arrest) border search is also conducted to (1) investigate possible criminal activity, and (2) gather evidence of

---

³ Interestingly, Defendant does not argue that Riley modified the border search doctrine by requiring that customs officials obtain a warrant before searching a cell phone at the border. Instead, Defendant's argument is that because this search does not qualify as a border search, it must be analyzed as a search incident to arrest, triggering the Riley standard. The court nevertheless will discuss the relationship between Riley and border searches of cell phones later in this order.

wrongdoing. Just as a search of a home is the classic example of a search requiring a warrant,[4] border searches constitute a paradigmatic exception to the warrant requirement. As discussed earlier in this order, an entire body of jurisprudence has been built around border searches, and the specific lexicon used by Defendant does not strip that paradigm of the temporal and spatial flexibility built into it.

Additionally, the word "investigatory," used as a qualifier by Defendant, is not helpful here. If the word "investigatory" in this context means further exploration into the possibility of a crime being committed, every border search would be investigatory in nature. In this particular instance, the search might not have uncovered additional information regarding the threat Defendant individually posed to "the United States' sovereign integrity," but it might have uncovered information about the larger organization involved in the smuggling of the methamphetamine, including information about more contraband entering into the country at that time or the location where Defendant was to drop off or transfer the drugs.[5] Even if this search had a purpose other than "protecting the United States' sovereign integrity by excluding unwanted persons or things," there is no way to discern that from the present record.

Finally, if the court were to adopt Defendant's proposition that searches conducted at the border cease being border searches upon an individual's arrest, it would only serve to encourage officials to delay a formal arrest until after the "investigatory" search. In other words, Defendant's rule exalting procedure over substance could be easily circumvented by tactically delaying an arrest until after the search.

The case cited by Defendant, United States v. Kim, does not support Defendant's position either, and is entirely distinguishable. In Kim, defendant's laptop was seized at the LAX as he was departing the country to Korea after a business trip. 103 F. Supp. 3d.

---

[4] See Payton v. New York, 445 U.S. 573, 586 (1980) ("It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.") (citations omitted).

[5] Defendant told authorities he had communicated with the individual to whom he was "reporting for shift work" via his cell phone.

at 38. The agent seizing the laptop admitted that he searched the defendant as he departed the country rather than as he entered in order to detect evidence of his criminal activity in the United States, based on information he had received about the defendant. Id. The court determined that that "[t]here was little or no reason to suspect that criminal activity was afoot at the time Kim was about to cross the border." Id. at 49. Additionally, the defendant's laptop was not searched at LAX, but was transported to San Diego to be searched for an extended period of time, while the defendant was allowed to depart on his flight. Id. at 57. Finally, the search involved the imaging and search of the entire contents of the defendant's laptop, aided by specialized forensic software. Id. at 40-41. The court held:

> … [U]nder the totality of the unique circumstances of this case, that the imaging and search of the entire contents of Kim's laptop, aided by specialized forensic software, for a period of unlimited duration and an examination of unlimited scope, for the purpose of gathering evidence in a preexisting investigation, was supported by so little suspicion of ongoing or imminent criminal activity, and was so invasive of Kim's privacy and so disconnected from not only the considerations underlying the breadth of the government's authority to search at the border, but also the border itself, that it was unreasonable.

Id. at 59.

While the purpose of the search was a consideration in the court's analysis, it was the combination of many factors, including the timing of the search, its intrusiveness level, and the lack of suspicion of ongoing or imminent criminal activity, that led the court to determine that under the "unique circumstances of this case," the search was unreasonable. See id. at 59. At no time did the court adopt the defendant's position that the investigatory nature of a search disqualifies it as a border search. Additionally, the facts of this case are entirely distinguishable. Here, Defendant's cell phone was manually searched at the border approximately an hour and a half after his arrest,[6] and the

---

[6] Defendant's statement that the search occurred more than five hours after his arrest is inconsistent with the record. While Defendant was detained at 3:30 a.m., he was advised that he was under arrest at 8:07 a.m., and his cell phone was searched at 9:39 a.m. (See Doc. No. 26-2). Detention and questioning during routine searches at the border are considered reasonable within the meaning of the Fourth Amendment. United States v. Espericueta–Reyes, 631 F.2d 616, 622 (9th Cir.1980) ("During such a

discovery of the methamphetamine provided more than reasonable suspicion of ongoing or imminent criminal activity.

### D. Riley and Border Searches of Cell Phones

While Defendant does not argue that Riley modified the standard for border searches of cell phones, the court addresses Defendant's related argument that the search of Defendant's cell phone was unreasonable under Riley's balancing test, despite its classification.

Riley presented the question whether the police may search digital information on a cell phone as part of a warrantless search incident to arrest. 134 S. Ct. at 2480. The Supreme Court held that as a general rule, police must obtain a warrant before searching the digital information on an arrestee's cell phone. Id. at 2495. Recognizing that the "ultimate touchstone of Fourth Amendment is reasonableness," id. at 2482, the Supreme Court applied a balancing test, weighing "the degree to which [the search] intrudes upon an individual's privacy" against "the degree to which it is needed for the promotion of legitimate governmental interests," id. at 2484-85.

With respect to "legitimate governmental interests" involved in a search of an arrestee's cell phone, the Supreme Court identified officer security and preservation of evidence under Chimel v. California, 395 U.S. 752 (1969). The Supreme Court noted that digital information on a cell phone cannot be used to physically harm an arresting officer, and therefore, requiring a warrant before a search of a cell phone would not impede officer safety. Id. at 2486. The Supreme Court reasoned that to the extent officer

---

search, some period of detention for these persons is inevitable. Nevertheless, so long as the searches are conducted with reasonable dispatch and the detention involved is reasonably related in duration to the search, the detention is permissible under the Fourth Amendment."). See also United States v. Bravo, 295 F.3d 1002, 1011-12 (9th Cir. 2002) (holding that an inspector's detention of defendant at the border did not become an "arrest" when the inspector briefly handcuffed defendant and escorted him 30–40 yards to a security office to search for weapons and contraband). Here, Defendant's five-hour detention was reasonably related to the secondary inspection of his vehicle, and therefore is considered a detention, not an arrest.

security might be implicated in a particular case, it would be better addressed through the consideration of case-specific exceptions to the warrant requirement, such as the exigent circumstances exception. Id. With respect to preservation of evidence, the Supreme Court concluded that once the officer has the phone in custody, the arrestee cannot erase the evidence accessible through the phone. In response to the government's argument that remote wiping could destroy digital evidence on a cell phone, the Supreme Court noted that the government could simply avoid this issue by disconnecting the phone from the network. Id. at 2487.

Second, considering the privacy interests involved, the Supreme Court concluded that today's cell phones differ both qualitatively and quantitatively from any other physical belonging of an individual. Id. at 2489. Given the immense volume and the sensitive nature of information stored on a cell phone, the Supreme Court recognized the following "interrelated consequences of privacy" of modern cell phones. Id. First, they collect in one place many different kinds of information – photos, messages, internet browsing history, contacts book, etc. – that reveal more information in combination than any "isolated record." Id. Second, because of their immense storage capacity, any one type of information discovered in a cell phone could be far more revealing than previously possible. Id. Third, cell phones contain information about every aspect of our lives, including health, finances, career, personal life, hobbies, physical locations, etc., as well as personal information potentially dating back for years. Id. Given these unique privacy concerns, the Supreme Court went on to conclude that a search of a modern cell phone could be more intrusive than a search of a person's home:

> Indeed, a cell phone search would typically expose to the government far more than the most exhaustive search of a house: A phone not only contains in digital form many sensitive records previously found in the home; it also contains a broad array of private information never found in a home in any form—unless the phone is.

Id. at 2491.

Thus, by weighing the privacy interests involved in a digital search against the government's interests in officer safety and preventing the destruction of evidence, the

Supreme Court concluded that officers must *generally* obtain a warrant before searching a cell phone incident to arrest. Id. at 2495.

This holding has several important implications for border searches of cell phones. First, it is important to recognize that this holding did not modify or undercut the paradigmatic border search exception. The Supreme Court framed its holding as a general rule,[7] and while it expressly declined to address case-specific Fourth Amendment exceptions, it explained, as an example, how the exigent circumstances exception might still apply. Id. at 2494. Aside from the exigent circumstances exception, Riley made no reference to the border search exception or any other case-specific exceptions to the warrant requirement previously announced by the Supreme Court, suggesting that the Supreme Court had every intention to limit its holding to searches incident to arrest.

Second, assuming that Riley is suggestive of a heightened level of protection for legitimate privacy interests associated with border searches of cell phones, what standard might apply? Courts will eventually work that out. But even if the standard were determined to be reasonable suspicion for a manual non-intrusive search, of reasonable duration and scope, such a standard is easily met in this case. Defendant was detained and later arrested based on the contraband discovered in his car. He told the agents he had been in communication with the person to whom he was "reporting for shift work" via his cell phone. The scope of the search was limited to Defendant's text messages, incoming calls, and portions of the call long. These facts, taken together, establish that the search here would be permissible even under the reasonable suspicion standard.

Adopting the reasonable suspicion standard currently used only for forensic examinations of digital devices, see Cotterman, 709 F.3d at 968, as the standard for all border searches of cell phones, may be a prudent way to harmonize Riley's concerns with

///

---

[7] "The police *generally* may not, without a warrant, search digital information on a cell phone seized from an individual who has been arrested." Id. at 2495 (emphasis added).

the salutary border search principles.[8]  First, the privacy interests involved in searches of modern cell phones are present both during manual and forensic searches.  While a forensic examination is more intrusive, a manual search of a modern cell phone certainly exposes the same type of information discussed in Riley – messages, photos, contacts list, call logs, etc. – both in isolated form and in combination.  Accordingly, a manual search can be just as invasive as a full forensic examination, rendering the two standards set forth by Cotterman both inconsistent with Riley's logic and impractical.

Second, current Ninth Circuit law on border searches requires no suspicion at all for manual searches of cell phones.  See Cotterman, 709 F.3d at 967.  Cotterman announced the reasonable suspicion standard for forensic examinations only, and explicitly stated that "routine" searches of the kind in Arnold would continue.  Id.  However, Riley's threshold recognition that cell phone searches are inevitably intrusive suggests the concept of a "routine" cell phone search provides little guidance to law enforcement officials and courts.

Finally, from the practical point of view, reasonable suspicion represents a workable standard, as it would allow customs officials to predictably do their job while affording a heightened level of privacy protection suggested by Riley.[9]  According to the Department of Homeland Security, "officers very likely do have reasonable suspicion in most searches of electronic devices based on existing screening methods and objective factors."  See Thomas Mann Miller, Digital Border Searches After Riley v. California, 90 Wash. L. Rev. 1943, 1996 (2015), citing Government Data Regarding Electronic Device Searches, ACLU.[10]  Thus, requiring reasonable suspicion for forensic and manual searches would likely impose only minimal burdens on customs officials' current

---

[8] The task of differentiating between "routine" and "nonroutine" searches has become increasingly challenging given our modern technology.  See Thomas Mann Miller, Digital Border Searches After Riley v. California, 90 Wash. L. Rev. 1943, 1989 (2015).

[9] Such a standard would also allay the concern expressed in Riley that ad hoc, case-by-case determination provides insufficient direction to law enforcement.  See 134 S. Ct. at 2492.

[10] See https://www.aclu.org/national-security/government-data-regarding-electronic-device-searches.

methods.  Finally, customs officials retain the ability to conduct suspicionless searches of cell phones in situations falling under the exigent circumstances exception.

Even assuming reasonable suspicion as the standard for all searches of cell phones at the border, the court finds that the manual search of Defendant's cell phone was reasonable in this case.  There is no dispute that the agents had reasonable suspicion to search Defendant's cell phone based on the contraband found in his car.  Additionally, Defendant indicated that he had been in cell phone communication with his boss, who had told him to report to work on that day at 5:00 a.m.  As such, it was reasonable for the agents to search Defendant's cell phone based on the totality of the circumstances as well as their experience as presented in the affidavit for the later forensic search that cell phones are routinely used in drug smuggling operations.

For all the foregoing reasons, Defendant's motion to suppress is DENIED.

DATED: June 3, 2016

JEFFREY T. MILLER
United States District Judge

16

16cr467 JM